PEOPLE OF PORTO RICO, Plaintiff and Appellee, v. RAMÓN MARÍN, Defendant and Appellant.

No. 3385. Argued May 22, 1928.—Decided July 24, 1928.

*José de J. Tizol* and *R. Rivera Zayas* for the appellant. *José E. Figueras* for the appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

On April 6, 1927, in the Manatí river near the Mata de Plátano bridge in the municipal district of Ciales was found the corpse of a man which later was identified as that of Tomás Peraza, forty-six years old, white, legitimate, married, born at Hatillo, workman.

The first impression was that he had been drowned. However, as the body bore marks showing acts of violence, an autopsy was ordered and the doctor who made it—Dr. Eladio Izquierdo—found "a wound in the temporal occipital region which penetrated not only the scalp but the skull also and through it reached the brain and ruptured an artery which is a ramification of the posterior cerebra, the rupture of which produced a hemorrhage which caused the death." There were other bruises, lacerations and wounds, six in all. The doctor opened the heart which was greatly dilated and found it empty of blood; he opened the lungs and found no water in them, nor in the intestines. He found no ecchymosis showing the action of a poison, from all of which he concluded that the wound in the brain had caused the death.

It has been said that Peraza was a workman. He was working under Manuel Marín, overseer of the Monserrate plantation in charge of certain fields situated in the jurisdiction of Ciales.

It was admitted as a fact that Marín sent another employee, Antonio Collazo, to call Peraza; that Peraza went very early on the 5th of April, 1927, to the house where Marín had his office and a room fitted out for gymnastics; that there Marín sent him to do a certain piece of work, and that between ten and eleven o'clock in the morning Peraza returned. Witnesses Juan and Ramón Olmeda saw him arrive riding a mare, tie the mare in the garage and go into the house. They did not see him come out. What occurred in the house?

Cruz Villalobos, Marín's stable-man who slept in the office building, testified at the trial that he arrived when Marín was asking Peraza how matters were progressing. Peraza answered that things were going well and then asked him whether he had been told anything "about some drinks of rum that he had taken the day before." Marín replied that he knew nothing about it, but that it was wrong for a man like him to drink. Peraza then said that it was true that he had taken the drinks, but that he would not do it again.

The witness said that at that moment Antonio Collazo arrived and when Peraza saw him he accused him of bringing the tales to Marín who denied it and told him that it was not his business. "Peraza remained so and said: 'The matter with me is that I am a very dangerous socialist.' Marín then struck him with his fist and tried to grab him by the neck and they clinched, and I went to separate them and he refused. Marín told us to get out and I withdrew and they went on clinching, and then Marín took the revolver away from Peraza who was carrying it in his coat and threw it on the dining-room table and they fell clinching in the big room, and shortly after Marín called Toño Collazo and asked him for the club." Collazo took the club, an Indian club which was duly recognized later, and went into the room with it. The witness testified that he did not see what took place in the room, but said "that immediately Ramón Marín came out of the room with his hands full of blood and holding the club. He washed them and said, 'do not get excited, you are also men.' Things quieted down and he went out and closed the house and told me not to let anybody in and left with Toño Collazo. . . . . He returned about one o'clock, told him to saddle his horse and left. He returned about three o'clock. . . . . Collazo was there. . . . . and both set about wrapping up the corpse and washing and he told me to remain under the shed watching, and later sent me with Toño to dig a hole behind the shed and I dug the hole for

him and shortly after Toño came down with the can and gave it to me to bury, a can containing blood. and tobacco leaves. . . . . I went to his house to sleep . . . . and I went to bed and at eight o'clock he called me and told me to come with him. . . . . we went in a car to the house. . . . . He went in and gave me a bundle . . . . and took the corpse and carried it and threw it into the car and I then threw in the bundle also and we followed the Ciales road to the Mata de Plátano bridge and he stopped the car close to the railing of the bridge and threw out the bundle. We came back here and he said to me 'God forbid that it be found, for if so he and I would be lost.' ''

What did Antonio Collazo say? He corroborated all of the foregoing and said that on arriving on the 5th at the house in which the office of Marín was he met the latter, Villalobos and Peraza and Peraza said: ''And does this man tell you things?'' Marín answered: ''That is what happens to a person who gets drunk, that he wants to pick a quarrel with every person he meets.'' Peraza replied: ''I may be a very dangerous socialist'' and Marín then jumped on him and pushed him against the wall and took the revolver from him and threw it on the table and threw him on the floor of the room and got on top of him and grabbed him by the throat and struck him with his fist . . . . . That he asked him for the club ''and then I jumped and gave him that bottle'' (pointing to the Indian club) ''and Marín struck him twice with the club and pushed it against his throat and threw him down and stuck the club here and remained with the club stuck here pressing, that we saw it from this side.''

He then described how Marín left the room and washed his hands and threatened to kill him if he told about it; how the room was washed and the can buried and how they wrapped the corpse in a quilt which they took from Villalobos' bed. It tallies in every particular with the latter's testimony. The only point of discrepancy in their testimony is where Collazo said that both saw Marín attack Peraza

with the club, whereas Villalobos said that he did not see what took place in the room when Collazo went in with the club.

Against this overwhelming evidence, what did the defendant prove? His own testimony was that when Collazo arrived Peraza insulted him and tried to strike him and as he tried to draw the revolver, Marín acted and threw himself against Peraza, disarmed him and grappled with him. Collazo then wanted to interfere but he told him not to do so and they grappled with each other and as Peraza threw him down and he felt that his strength was giving way, he shouted: "Toño, give me a club, anything, and at that moment Toño ran to the room . . . . and without more struck his head once with the club . . . . and then a second time and felt as if the body of that man became limp on top of me . . ." He got up and found himself covered with blood "and I went out into the dining-room and said to Crucito, please give me some water to wash my hands and remove some stains from here. And he was there with Toño Collazo, and I told Crucito Villalobos, who was a short distance behind as if crying, and Collazo, who looked frightened, not to worry. You, Crucito, saddle me a horse. Then, while taking the horse I began to think what I should do in such a case. Could I inform the authorities about that fact, about a man who had really at that moment saved my life? I decided then to keep silent, thinking that in that way I could hide it from justice."

He admits the washing of the room, the burying of the can, the wrapping of the corpse in a quilt and taking it out at night with Villalobos and throwing it into the river. His exact words concerning the final incident were: "I was waiting there for Antonio Collazo who had promised to come. . . . No, Sir; he did not come, and then I found myself with that corpse without knowing what to do, and always thinking that I could hide it from justice I made up my mind to put it into the car. . . . We arrived at Mata de Plátano and there we disposed of it."

Such was the evidence introduced. On the strength of it the jury brought in a verdict of guilty of murder in the second degree and the court sentenced Marín to twenty-two years in the penitentiary at hard labor. 'The defendant appealed from that judgment and in his brief has assigned three errors.

Let us take up the first.

When the district attorney made his opening statement at the trial explaining the case and what he intended to prove the defendant objected to any reference being made to the facts charged against him in connection with the concealment of the body of Peraza on the ground that such facts had not been alleged in the information. The jury withdrew, both parties argued the point and the court overruled the objection of the defendant. The question was raised again during the examination of the evidence with the same result.

In arguing the assignment the appellant cited no jurisprudence in support of his contention. He said that it was sought to charge the accused with a different crime, that he was not prepared to refute the charge and that such facts tended to prejudice the jury against him.

The prosecution quotes from Underhill on Criminal Evidence which in our opinion properly settles the question. It is as follows:

The perpetration of a homicide is well calculated to create a perturbation in the mind of any one implicated in it, that will manifest itself by the agitation subsequently noticeable in his con · duct. If the charge that the accused did the killing is disputed, or if it is supported by circumstantial evidence only, such evidence is peculiarly appropriate. It is proper, therefore, to show that the accused acted unnaturally and confusedly, was excited and nervous in manner, spoke hurriedly and in a low tone, looked pale and ap peared greatly distressed shortly after the crime, or when accused of it.

"If from his connection with the deceased it was natural to expect the accused to show grief or sorrow at the mention of the death of the victim, it is proper to show that he did not do so. Where the

accused is a relative of the deceased and he was naturally expected to go to his funeral, it may be shown that he failed to do so.

"The conduct of the accused after he hears that he is suspected is also relevant. Any act proving, or tending to prove, an effort or a desire on his part to obliterate the evidence of a crime, as by washing his hands or clothing to remove blood stains, or by hiding or destroying weapons, concealing property proved to have belonged to the deceased, or his flight or attempts to escape, or his nervousness or silence when first charged with the crime, is always relevant, for from these facts, if unexplained, the jury may justly apprehend his mental condition and may infer that they indicate a consciousness of guilt on his part." Underhill on Criminal Evidence, p. 382.

As the prosecuting attorney reasons later in his brief, there is no doubt that it is not necessary to allege in an information acts committed before or after the crime, and the failure in the present case to allege the concealment of the crime by the accused does not imply that The People could not present that evidence, which is always pertinent as a part of the *res gestae,* in order to show the state of mind of the accused, his composure and cold-bloodedness in the perpetration of the act, when after its commission he acts, as in the present case, in the manner recited and which only show a perverted and malignant heart, as expressed by the code in treating of murder.

The second and third assignments of error may be considered and decided together.

After the examination of the evidence for the prosecution counsel for the accused moved for a peremptory acquittal for the reason that the only direct evidence was the testimony of an accomplice. The court overruled the motion explaining that it would give the proper instructions to the jury. This is said to be an error.

The appellant contends also that the verdict is erroneous because the jury were unduly influenced by the evidence on the concealment of the corpse and by the decision of the court in submitting to them the question of whether or not witness

Antonio Collazo was an accomplice, and if so, whether there was sufficient corroboration.

The instructions of the court on these matters are very broad and correct. The case as a whole was submitted to the jury. It was for them to decide whom they would believe, whether Collazo or Marín, and they adjusted the conflict against Marín. When the conflict was adjusted it was out of the question to maintain that Collazo was an accomplice or accessory. But even if he were, there is in the testimony of Villalobos such clear and strong corroboration that his testimony would always have been admissible.

This is a very clear case of a crime committed with extraordinary wantonness and cruelty, thoroughly and promptly investigated and submitted by the district attorney to the court and the jury. The court conducted the trial with equanimity. The defendant had all of the ample opportunities guaranteed to him by our laws and the verdict of the jury could not have been other than that rendered.

The judgment appealed from must be affirmed.